[No. 79332-8.   En Banc.]
Argued October 16, 2007.      Decided July 24, 2008.

THE STATE OF WASHINGTON, *Petitioner*, v. KHA DANH MAGERS, *Respondent*.

176

*Gerald A. Horne, Prosecuting Attorney*, and *P. Grace Kingman, Deputy*, for petitioner.

*Rita J. Griffith*, for respondent.

¶1 ALEXANDER, C.J. — The State of Washington seeks reversal of a decision of the Court of Appeals in which that court reversed Kha Magers's convictions on charges of second degree assault and unlawful imprisonment. In reaching its decision, the Court of Appeals concluded that the trial court erred in admitting evidence of certain prior bad acts by Magers to show a recanting victim's fear of Magers, thereby casting doubt on the victim's credibility. We reverse the Court of Appeals.

I

¶2 Kha Magers and Carissa Ray dated for several years, during which time they had two children. In December 2003, Magers was arrested for domestic violence after an incident in which he allegedly shoved Ray. Following Magers's arrest, an order was issued by the Pierce County Superior Court prohibiting Magers from having any contact with Ray. Magers was, however, released from jail the day following his arrest. A domestic violence charge that was filed against Magers following his arrest was subsequently dismissed.

¶3 Approximately one month after Magers was arrested for the aforementioned incident, he was arrested again and this time was charged in Pierce County Superior Court with the second degree assault and unlawful imprisonment of Ray. It was alleged in the information that he committed

both crimes while armed with a deadly weapon. Magers was informed by way of a "Persistent Offender Notice" that pursuant to the Persistent Offender Accountability Act (POAA) he was facing a "third strike" due to the existence of two prior second degree assault convictions and one prior conviction for first degree burglary. Clerk's Papers (CP) at 4. The State later filed an amended information adding a misdemeanor charge of violation of a no-contact order.

¶4 Magers filed a motion in limine in which he sought to exclude evidence of his December 2003 arrest for domestic violence, entry of the no-contact order, his prior convictions for second degree assault and first degree burglary, and the fact that he had spent time in jail/prison for fighting and was released therefrom. Magers also sought an order permitting him to introduce evidence that he faced a life sentence if convicted. After a hearing, the trial court denied Magers's motions, with the exception that it indicated that it would permit Magers to present testimony that he faced a "lengthy sentence." Verbatim Report of Proceedings (VRP) at 224.

¶5 At trial, a police officer who had responded to the incident leading to the charge of assault and unlawful imprisonment testified that Ray's stepfather reported the domestic dispute that led to Magers being charged. Another responding officer testified that Ray's stepfather had called 911 to report his concerns about Ray because Magers was inside Ray's residence in violation of the December 2003 no-contact order and that he was threatening to kill Ray.

¶6 One of the responding Tacoma police officers, Jim Lang, indicated in his testimony that upon arrival at Ray's residence, he knocked on the front door. According to Lang, Ray, with one of her sons by her side, responded to his knock. Officer Lang said that he asked Ray if Magers was inside the residence, to which she responded, "No." VRP at 409. Officer Lang went on to testify that Ray "was scared. Her eyes were huge. . . . She kept looking behind her. . . . Ray was very uneasy. . . . Just her demeanor [indicated to me] something was terribly wrong." *Id.* Based on these

observations, Officer Lang asked Ray step outside of her residence. When she complied, he again asked her if Magers was inside the home. This time Ray replied affirmatively.

¶7 According to Lang's testimony, after Ray confirmed that Magers was inside the home, she started crying and stated that Magers is "violent. He's going to hurt me. Please don't tell him that I told you that he was in there." VRP at 430. Officer Lang also testified that Ray told him that Magers had just gotten out of jail for domestic violence. Lang said that Ray appeared to him to be "obviously traumatized." VRP at 436.

¶8 Officer Lang testified, additionally, that Ray continued to provide him with details of what happened. According to Officer Lang, Ray informed him that Magers had held a sword to the back of her neck and told her, "If you listen to me and do what I say, we'll be happy. But if you do not, I'm going to be mean, and I will cut off your head." VRP at 442-43. Ray further informed Lang that the threats continued for several hours and that Magers would not allow her to leave the residence. Ray told Lang that she eventually convinced Magers to allow her to go to a convenience store, provided she was unaccompanied by her children. According to Ray, while she was at the convenience store, she called her mother and provided her with details of her circumstances.

¶9 Magers's counsel had registered an objection to Officer Lang's testimony about Ray's statements to him, based on grounds that it was hearsay. The trial court determined that Ray's statements to the police officer were admissible pursuant to ER 803(a)(2) as excited utterances.

¶10 Shortly after Magers was charged with second degree assault and unlawful imprisonment, Ray provided "somebody in the prosecutor's office" with a letter in which she recanted the version of events that she had relayed to Officer Lang. VRP at 326. One month later, in another letter to the prosecutor's office, Ray repeated her recantation.

¶11 Ray testified at trial, indicating that she was aware that Magers had previously been "in trouble for . . . fighting." VRP at 265. She also testified that Magers was released from jail after the birth of their first child and that his December 2003 arrest for domestic violence resulted in a no-contact order being entered.

¶12 Ray's additional testimony about the incident was generally consistent with the statements she made in the letters in which she recanted the statements she had made to Lang. According to her testimony, she asked Magers to watch their children at her residence so that she could go to a job interview. Ray admitted that she was aware of the no-contact order but said that she "couldn't miss [her] job interview" and had no one else to watch the children. VRP at 356. Ray stated that when her mother and stepfather called the residence asking her to come to their home, she told them that she and Magers were fighting and that he had a knife, making it impossible for her to leave. She indicated that this statement was a lie, which she told so that she would not have to go to their home. Ray testified that she frequently lied to her mother and stepfather in order to avoid being around her stepfather, whom she claimed had sexually molested her when she was a child. Ray disclosed that she later drove to a store and called her mother from a pay telephone to explain why she refused to go to her mother's home. Ray testified that she was surprised when the police showed up at her residence because she did not expect her mother and stepfather to call the police. Consistent with the trial court's ruling on the motion in limine, Ray indicated during cross-examination that she was aware that Magers was facing a lengthy prison sentence.

¶13 Following the presentation of evidence, Magers excepted to jury instruction 5. It provided that "[e]vidence has been introduced in this case on the subject of the defendant's prior bad acts for the limited purpose of the victim's state of mind and her credibility. You must not consider this evidence for any other purpose." CP at 124; *see* VRP at 553.

¶14 The jury convicted Magers on all three charges, and he was sentenced to life in prison without the possibility of parole. Magers appealed only his second degree assault and unlawful imprisonment convictions. The Court of Appeals, Division Two, reversed and remanded with instructions that the evidence of "the 'fighting' not be admitted and that the evidence of domestic violence against Ray be accompanied by an instruction consistent with [*State v.*] *Cook*[, 131 Wn. App. 845, 129 P.3d 834 (2006)]." *State v. Magers*, noted at 134 Wn. App. 1061, 2006 Wash. App. LEXIS 1967, at *14. The State petitioned this court to review the Court of Appeals' decision, and we granted its petition as well as Magers's cross petition. *State v. Magers*, 160 Wn.2d 1021, 163 P.3d 794 (2007).

## II

¶15 A trial court's admission of evidence is reviewed for abuse of discretion. *State v. Pirtle*, 127 Wn.2d 628, 648, 904 P.2d 245 (1995). This court "will not disturb a trial court's rulings on . . . the admissibility of evidence absent an abuse of the court's discretion." *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). Abuse of discretion exists "[w]hen a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons." *Id.*

## III

### A. State of Mind

¶16 The State contends that evidence of Magers's prior bad acts, including the fact that he had been in "trouble" and in jail for fighting, was admissible to prove Ray's state of mind: that she "reasonably feared bodily injury." *See* Pet. for Review at 7-14. Clearly, evidence that Magers was arrested in December 2003 for shoving Ray and that a no-contact order was entered following that arrest is admissible. As we indicated above, Magers was charged with violating the 2003 no-contact order and, consequently,

it was entirely appropriate for the State to put on evidence regarding entry of the order and his violation of it.

¶17 Insofar as the evidence of fighting is concerned, the cases of *State v. Ragin*, 94 Wn. App. 407, 972 P.2d 519 (1999), and *State v. Barragan*, 102 Wn. App. 754, 9 P.3d 942 (2000), which are cited by the State, are instructive. In each of those cases, a defendant was charged with the crime of felony harassment. In *Ragin*, the charge was based on the defendant's action in calling the victim on the telephone from jail and threatening him. The Court of Appeals held there that it was not error to admit evidence of certain of the defendant's prior violent acts in order to demonstrate to the jury that it was reasonable for the victim to be fearful of the defendant's threats. In *Barragan*, a case where a defendant was charged with first degree assault as well as harassment, the trial court admitted evidence of prior assaults by the defendant. The Court of Appeals, Division Three, affirmed the trial court's admission of evidence of the defendant's past violent acts, reasoning that the victim's knowledge of the defendant's acts was relevant to the harassment charge in order to show that the victim reasonably feared that the defendant's threats to him would be carried out. We approve of the reasoning of the Court of Appeals in both of these cases.

¶18 In *Ragin* and *Barragan*, the crime victim's fear was an issue. It was an issue here as well. We say that because the jury was provided with a "to convict" instruction that listed the elements of the crime that must be proved by the State. Those elements are that (1) on the date in question, Magers intentionally assaulted Ray with a deadly weapon and (2) the assault occurred in the state of Washington. CP at 127; 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.11, at 381 (2d ed. 1994). Because assault was an element of the charged offense, the jury was properly provided with an additional instruction that defined "assault." The instruction indicated, in part, as follows:

An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 128. In light of this definition of "assault," "reasonable fear of bodily injury" was an issue in the case.

¶19 As in *Ragin* and *Barragan*, evidence of Magers's prior violent misconduct was relevant on the issue of whether Ray's apprehension and fear of bodily injury was objectively reasonable, those elements being at issue since the charged act does not itself conclusively establish "reasonable fear of bodily injury." *See Powell*, 126 Wn.2d at 262. Evidence of prior misconduct is admissible if it is "necessary to prove a material issue." *Id.*

¶20 Although the Court of Appeals said that the evidence was not admissible to prove "reasonable fear of bodily injury" because "Magers never disputed this element," this is an incorrect conclusion. *Magers*, 2006 Wash. App. LEXIS 1967, at *7. We say that because in a criminal case, a not guilty plea puts the burden on the State "to prove every essential element of a crime beyond a reasonable doubt." *State v. Cantu*, 156 Wn.2d 819, 825, 132 P.3d 725 (2006) (citing *State v. Deal*, 128 Wn.2d 693, 698, 911 P.2d 996 (1996) (quoting *State v. Hanna*, 123 Wn.2d 704, 710, 871 P.2d 135 (1994))). The State, therefore, bears the burden of proving every element of second degree assault, including the element of assault that is defined as the "reasonable fear of bodily injury." Consequently, the State properly presented evidence of Ray's "reasonable fear of bodily injury" to prove the element of assault as defined in the jury instructions. Therefore, we conclude that evidence of Magers's prior bad acts, including the acts leading to his arrest for domestic violence and that he had been in trouble for fighting, was properly admitted to demonstrate Ray's "reasonable fear of bodily injury."

## B. Credibility

¶21 The State also contends that the Court of Appeals erred when it concluded that the evidence that Magers had been in custody for fighting and that he was arrested for domestic violence was not admissible on the issue of the victim's credibility. The trial court admitted this evidence based on its determination that it was admissible pursuant to ER 404(b) to assist the jury in assessing the victim's credibility. ER 404(b) provides that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

To justify the admission of prior acts under ER 404(b), there must be a showing that (1) the evidence serves a legitimate purpose, (2) the evidence is relevant to prove an element of the crime charged, and (3) the probative value outweighs its prejudicial effect. *State v. DeVries*, 149 Wn.2d 842, 848-49, 72 P.3d 748 (2003) (citing *State v. Lough*, 125 Wn.2d 847, 853, 889 P.2d 487 (1995)). Evidence is relevant if it has a tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. ER 401.

¶22 The State relies on *State v. Grant*, 83 Wn. App. 98, 920 P.2d 609 (1996), to support its contention that evidence of prior acts of violence is admissible, in a criminal case where domestic violence is alleged, in order to assist the jury in assessing the victim's credibility. In *Grant*, the crime victim changed her story after initially denying that she was assaulted by the defendant. The trial court admitted evidence of the defendant's prior assaults on the victim under ER 609(a). On appeal, Division One of the Court of Appeals held that the evidence was admissible under ER 404(b), reasoning that evidence of prior acts of violence

toward the victim helps the jury assess the credibility of the victim at trial and understand why the victim told conflicting stories.

¶23 Magers relied upon a decision of Division Two of the Court of Appeals, *Cook*, 131 Wn. App. 845, with regard to the admission of evidence under ER 404(b). In *Cook*, the court indicated that evidence of past acts of violence by the defendant toward the victim is admissible to assess the victim's state of mind only. In *Cook*, the victim recanted earlier statements to the police that the defendant, the victim's boyfriend, had assaulted her. The trial court admitted evidence of the defendant's past violence toward the victim with a limiting instruction to the jury to consider the evidence introduced to assess the credibility of the victim. On appeal, Division Two agreed with the reasoning of Division One in *Grant* that a defendant's prior acts of domestic abuse against the alleged victim are admissible under ER 404(b), but only "to [assist the jury in assessing] the victim's state of mind at the time of the inconsistent act," not "for the generalized purpose of assessing the victim's credibility." *Cook*, 131 Wn. App. at 851. The court explained that instructing the jury to assess the evidence in terms of the victim's credibility would put emphasis on the husband's prior conduct, suggesting that it is more likely that he had a propensity to act violently against the victim. The court went on to say that if the jury is instructed to assess the evidence in terms of the victim's state of mind, the jury would focus on the state of mind rather than the defendant's propensity to abuse the victim. The Court of Appeals' decision here was consistent with the decision in *Cook*, the court indicating that the evidence of prior domestic violence is admissible only to enable the jury to assess the victim's state of mind, not her credibility.

¶24 We agree with the rationale set forth by the court in *Grant*, at least insofar as evidence of prior domestic violence is concerned. As Karl B. Tegland has observed in his handbook on Washington evidence, "In prosecutions for crimes of domestic violence, the courts have often admitted

evidence of the defendant's prior acts of domestic violence on traditional theories . . . . Recently, however, the courts have occasionally been persuaded to admit such evidence on less traditional theories, tied to the characteristics of domestic violence itself." 5D KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE ch. 5, at 234 (2007-08). Tegland discussed the admission of such evidence in his evaluation of *Grant*:

> [T]he defendant was charged with assaulting his wife[.] [T]he defendant's prior assaults against his wife were admissible on the theory that the evidence was "relevant and necessary to assess Ms. Grant's [the victim's] credibility as a witness and accordingly to prove that the charged assault actually occurred." . . . "The jury was entitled to evaluate her credibility with full knowledge of the dynamics of a relationship marked by domestic violence and the effect such a relationship has on the victim."

*Id.* at 234-35 (fourth alteration in original) (quoting *Grant*, 83 Wn. App. at 106, 108). We adopt this rationale and conclude that prior acts of domestic violence, involving the defendant and the crime victim, are admissible in order to assist the jury in judging the credibility of a recanting victim. Here, evidence that Magers had been arrested for domestic violence and fighting and that a no-contact order had been entered following his arrest was relevant to enable the jury to assess the credibility of Ray, who gave conflicting statements about Magers's conduct.

## C. Limiting Instruction

■ ¶25 The State asserts, additionally, that the Court of Appeals erred in concluding that the following limiting instruction should not have been given to the jury: "Evidence has been introduced in this case on the subject of the defendant's prior bad acts for the limited purpose of the victim's state of mind and her credibility. You must not consider this evidence for any other purpose." CP at 124. Magers asserts, consistent with the decision of the Court of

Appeals, that the trial court erred in providing this instruction and that the limiting instruction should have directed the jury to assess the evidence in terms of the victim's state of mind only. Based on our determination that prior acts of domestic violence involving the defendant and the crime victim are admissible in order to assist the jury in judging the credibility of a recanting victim, we hold that it was not error for the trial court to provide the limiting instruction to the jury. It properly allowed the jury to consider Magers's prior acts of domestic violence toward the victim on the issue of the victim's credibility and his other acts of violence, "fighting," on the issue of Ray's state of mind regarding her fear of Magers.

## IV

¶26 Magers has cross-petitioned, contending that the trial court erred in a number of ways. We discuss each of his contentions.

### A. Excited Utterance

¶27 Magers contends that the Court of Appeals erred when it upheld the trial court's admission of Ray's statements to Officer Lang as excited utterances. Magers asserts that these statements were not excited utterances because "under the state's theory of the case, [Ray] had the capacity to consider her situation, and decide to respond untruthfully that Mr. Magers was not at the house." Answer to Pet. for Review at 13.

¶28 A trial court's determination that a hearsay exception applies is judged on an abuse of discretion standard. *State v. Thomas*, 150 Wn.2d 821, 854, 83 P.3d 970 (2004). ER 803(a)(2) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" may be admissible. A statement qualifies as an excited utterance if (1) a startling event occurred, (2) the

declarant made the statement while under the stress or excitement of the event, and (3) the statement relates to the event. *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001).

¶29 This court has addressed the question of whether a statement of a declarant may be admitted as an excited utterance where, as here, a portion of the hearsay statement was fabricated. In *State v. Brown*, 127 Wn.2d 749, 903 P.2d 459 (1995), we concluded that it was error to admit a statement as an excited utterance in such circumstances. However, in a later case, *Woods*, 143 Wn.2d at 600, we indicated that the alleged victim's deliberate omission of details in a statement, which the defendant asserted was equivalent to the falsehoods in *Brown*, does not mean that the statement is not an excited utterance. More recently, in *State v. Young*, 160 Wn.2d 799, 808, 161 P.3d 967 (2007), we said, regarding recantation, that it is for the "trial court to weigh the credibility of a recantation against the evidence that a statement is reliable because it was made spontaneously while under the influence of a startling event and to determine that the statement is admissible as an excited utterance."

¶30 We agree with the Court of Appeals that the fact that Ray told the police a falsehood when she denied Magers's presence in her house does not mean that the remainder of her statements were not spontaneous and truthful. It is reasonable to conclude that Ray's initial statement to Officer Lang that Magers was not at her home was due to her fear of Magers. Here, the trial judge, consistent with our decision in *Young*, weighed the credibility of Ray's statements outside the presence of the jury and determined that Ray's statements to Officer Lang were admissible as excited utterances. We conclude, as did the Court of Appeals, that the trial court did not abuse its discretion in reaching this determination.

## B. Life without Parole

¶31 Magers contends that the trial court "denied him his federal and state constitutional rights" when it precluded him from eliciting testimony that he faced convictions for third strike offenses and a sentence of life imprisonment without the possibility of parole. Answer to Pet. for Review at 13-14. Magers reasons that if the jury had known that Ray was aware that Magers was facing life in prison, it could have concluded, contrary to the State's position, that Ray had no reason to be fearful of him. Magers provides no specific authority to support this contention other than asserting that he "had a right to present evidence to meet the State's case." *Id.* at 15.

¶32 The United States Supreme Court has indicated that " '[i]t is well established that when a jury has no sentencing function, it should be admonished to "reach its verdict without regard to what sentence might be imposed." ' " *State v. Townsend*, 142 Wn.2d 838, 846, 15 P.3d 145 (2001) (alteration in original) (quoting *Shannon v. United States*, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40, 95 S. Ct. 2091, 45 L. Ed. 2d 1 (1975))). Punishment is a question of legislative policy; the jury's function is to find the facts. *State v. Bunting*, 115 Wn. App. 135, 139, 61 P.3d 375 (2003); *State v. Todd*, 78 Wn.2d 362, 375, 474 P.2d 542 (1970). "The legislature has not seen fit to delegate sentencing under the POAA to the jury." *Bunting*, 115 Wn. App. at 139. "This strict prohibition against informing the jury of sentencing considerations ensures impartial juries and prevents unfair influence on a jury's deliberations. . . . We see no reason to create an exception for noncapital . . . cases." *Townsend*, 142 Wn.2d at 846-47.

¶33 As we observed above, the trial court did permit Magers's counsel to ask Ray whether she was aware Magers faced a "lengthy sentence." VRP at 224. This allowed the defense to advance its theory without running

afoul of established case law. We conclude that the trial court did not abuse its discretion when it limited testimony regarding Magers's possible sentence.

## C. Officer Lang's Opinion Testimony

■ ¶34 Magers contends that Officer Lang's testimony that he could tell " 'something was terribly wrong' " with Ray and that Ray was " 'obviously traumatized' " was impermissible opinion testimony as to guilt and that its admission was, therefore, constitutional error. Answer to Pet. for Review at 15.

¶35 Although Officer Lang did offer these opinions, they were not opinions about Magers's guilt or Ray's credibility. Rather, Officer Lang described Ray's demeanor in conjunction with other observations that he made, such as the fact that Ray was crying and seemed unfocused. In sum, Officer Lang's statements provided context only to the scene he had witnessed and did not constitute impermissible opinion testimony.

## D. Prosecutorial Misconduct

¶36 Magers contends that the prosecutor committed misconduct during her opening statement and closing argument.

¶37 During her opening statement, the deputy prosecuting attorney attempted, over Magers's objection, to provide the jury with what she denominated "a nutshell view of the elements of the offenses." VRP at 248. The trial court allowed the prosecutor to give an "abbreviated" rendition of the elements of Magers's alleged offenses, in which she described the elements of second degree assault as an intentional assault of Ray with a deadly weapon. VRP at 249. In that regard, the deputy prosecutor stated that "[y]ou will be furnished with the definition of assault, and the State will be arguing in the end that an assault can also be an intention to create fear and apprehension of bodily harm." VRP at 250.

¶38 In order to establish prosecutorial misconduct, a defendant must show "that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial." *State v. Hughes*, 118 Wn. App. 713, 727, 77 P.3d 681 (2003) (citing *State v. Stenson*, 132 Wn.2d 668, 718, 940 P.2d 1239 (1997)). "Prejudice is established only if there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict." *Pirtle*, 127 Wn.2d at 672 (citing *State v. Evans*, 96 Wn.2d 1, 5, 633 P.2d 83 (1981)). During an opening statement, a prosecutor may state what the State's evidence is expected to show. *State v. Brown*, 132 Wn.2d 529, 563, 940 P.2d 546 (1997).

¶39 In determining whether prosecutorial misconduct has occurred, we first look at whether the defendant objected to the alleged misconduct. *State v. Gentry*, 125 Wn.2d 570, 640, 888 P.2d 1105 (1995). If the defendant objected, we evaluate (1) whether the prosecutor's comments were improper and (2) whether a substantial likelihood exists that the improper statements affected the jury's verdict. *Id.* The defendant bears the burden of showing both prongs of prosecutorial misconduct. *Hughes*, 118 Wn. App. at 727.

¶40 Here, as we noted above, Magers did object to the admission of the prosecutor's "abbreviated" rendition of the elements of Magers's alleged offenses and this objection was overruled. The prosecutor's statements do not strike us as improper or prejudicial. Even if they were, a curative instruction to disregard the comments could have obviated any prejudice. No such instructions were sought by Magers.

¶41 During closing argument, the deputy prosecutor asked the jurors to "consider the dynamics of domestic violence relationships" as they were discussed in voir dire. VRP at 580. Magers objected that the State was discussing facts not in evidence. Although the objection was sustained, the prosecutor continued this line of questioning, saying, "knowing what you know about domestic violence, whether or not the traits and dynamics of those types of relationships." VRP at 581. At that point Magers objected again.

After the trial court overruled this objection, the prosecutor again asked the jurors to determine whether the case was "an example of domestic violence relationships and the dynamics within them." *Id.*

¶42 A prosecutor may not refer to evidence not presented at trial. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). But, in closing argument, a prosecutor has wide latitude to draw reasonable inferences from the evidence and to express such inferences to the jury. *Stenson*, 132 Wn.2d at 727. A prosecutor's remarks should be viewed in "context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." *Brown*, 132 Wn.2d at 561 (citing *Russell*, 125 Wn.2d at 85-86).

¶43 The defense contends that the prosecutor's remarks in this case are similar to those in *Belgarde* where a prosecutor made inflammatory remarks equating the American Indian Movement with " 'Sean Finn' [sic] of the IRA [Irish Republican Army]" and " 'Kadafi [sic].' " *State v. Belgarde*, 110 Wn.2d 504, 508, 755 P.2d 174 (1988). These accusations were based on the prosecutor's own personal recollection of the events at Wounded Knee. This court found that these statements were not based on any of the evidence in the record and were made to appeal to the jury's passion and prejudice.

¶44 The facts in this case are not nearly as flagrant as those in *Belgarde*. Clearly, the prosecutor's comments as to the "dynamics of domestic violence relationships" in relation to the total argument cannot be viewed to be so egregious as to warrant reversal.

## E. Cruel Punishment

¶45 Magers contends, finally, that the sentence he received, life without the possibility of parole, is punishment that runs afoul of the Eighth Amendment to the United States Constitution and article I, section 14 of the

state constitution.[1] He also contends that his sentence violates the Sixth Amendment to the United States Constitution[2] as interpreted by the United States Supreme Court in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

¶46 Insofar as the latter argument is concerned, the Court of Appeals has held that *Blakely* does not apply to sentencing under the POAA, *Blakely* being specifically directed at exceptional sentences. *State v. Ball*, 127 Wn. App. 956, 957, 959-60, 113 P.3d 520 (2005). We agree with this conclusion and determine that Blakely has no application to the instant case.

¶47 Magers's arguments that the punishment that was imposed violated his rights under the Eighth Amendment to the United States Constitution and article I, section 14 of the state constitution are equally without merit. In *State v. Thorne*, 129 Wn.2d 736, 772-73, 921 P.2d 514 (1996), this court applied the factors set forth in *State v. Fain*, 94 Wn.2d 387, 397, 617 P.2d 720 (1980), to determine whether a life sentence violated the federal or state constitutional provisions on the basis that it was disproportionate to the underlying offenses. We conclude, after reviewing the *Fain* factors[3] and observing that Magers had past convictions for second degree assault and first degree burglary, that the sentence imposed on Magers of life imprisonment without the possibility of parole is not grossly disproportionate to the offenses committed by Magers. Consequently, the

---

[1] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. "Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted." CONST. art. I, § 14.

[2] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." U.S. CONST. amend. VI.

[3] The factors identified in *Fain* are (1) the nature of the offense, (2) the legislative purpose behind the criminal statute, (3) the punishment defendant

punishment imposed on Magers did not violate the federal or state constitutions.

¶48 We reverse the Court of Appeals.

OWENS and J.M. JOHNSON, JJ., and BRIDGE, J. PRO TEM., concur.

¶49 MADSEN, J. (concurring) — The error in admitting evidence of fighting was harmless in this case. Thus, I agree with the result reached by the majority. I write separately, however, because I disagree with the majority on two points.

¶50 First, the majority holds that Kha Magers's prior fighting incident was properly admitted to show Ms. Carissa Ray's state of mind, i.e., that she reasonably feared bodily injury. But under the State's theory of second degree assault, it was not required to prove that Ms. Ray reasonably feared bodily injury. Rather, the State was required to prove that a reasonable person under the same circumstances would have a reasonable fear of bodily injury. Thus, the State did not have a burden to demonstrate Ms. Ray's state of mind as an element of assault. More importantly, it is clear that the State did not offer the evidence of Magers's fighting to demonstrate the reasonableness of Ms. Ray's fear. Rather, since Ms. Ray recanted and denied the assault, the State offered the evidence of fighting to explain why Ms. Ray had changed her testimony, i.e., to impeach Ms. Ray's testimony.

█ ¶51 Although I agree with the majority that evidence of prior acts which are offered to explain recantation by a victim of domestic violence may be admissible under ER 404(b), I disagree that the evidence of fighting was admissible for this purpose under the facts here. The charge of fighting did not involve Ms. Ray and was, therefore, not a part of the dynamic of domestic violence.

---

would have received in other jurisdictions for the same offense, and (4) the punishment meted out for other offenses in the same jurisdiction. *Fain*, 94 Wn.2d at 397.

¶52 Nevertheless, while I believe the trial court erred in admitting the evidence of fighting, it was harmless error. As the majority points out, Magers was charged with violating the 2003 no contact order. Thus, it was proper for the State to present evidence regarding entry of the order and violation of the order as part of the res gestae of the crime. The court also properly admitted evidence of the prior domestic violence to explain Ms. Ray's recantation. Thus, evidence of Magers's prior bad acts, except for fighting, was properly before the jury. Although improperly admitted, the fighting incident was only a small part of the evidence, merely mentioned by Ms. Ray in testimony that Magers had been "in trouble for . . . fighting." Verbatim Report of Proceedings at 265. In light of the admissible evidence and the brief reference to fighting, the trial court's error in admitting the evidence of fighting was of minor significance in reference to the evidence as a whole. *State v. Yates*, 161 Wn.2d 714, 764, 168 P.3d 359 (2007). Accordingly, I concur in the result of the majority.

FAIRHURST, J., concurs with MADSEN, J.

¶53 C. JOHNSON, J. (dissenting) — The majority in this case holds that prior acts of domestic violence "are admissible in order to assist the jury in judging the credibility of a recanting victim." Majority at 186. Unfortunately, this language ignores the express prohibition of the rule and opens wide a door we have previously opened only in a narrow set of circumstances. The purpose of ER 404(b) is to prevent a jury from convicting a defendant based on propensity or character evidence. We have long warned of the potential risk this type of evidence has in prejudicing the defendant and to be aware of situations " 'where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon it.' " *State v. Smith*, 106 Wn.2d 772, 774, 725 P.2d 951 (1986) (quoting *State v. Goebel*, 36 Wn.2d 367, 379, 218 P.2d 300 (1950)); *see also State v. Saltarelli*, 98 Wn.2d 358, 362, 655 P.2d 697 (1982) (holding that because of the

high potential for risk of prejudice, evidence of prior bad acts must be closely scrutinized and admitted *only* if certain criteria are met). This case presents an example of why this prohibition exists, especially where the prior bad acts of the defendant were admitted to impeach the *victim* testifying at trial.

¶54 The majority here validates the admission of evidence of the defendant's prior bad acts through the testimony of the victim, who denies the incident occurred. Under the evidence presented at trial, the inescapable conclusion is that the defendant was convicted solely on the basis of past bad acts—exactly what ER 404(b) prohibits. The Court of Appeals recognized this and correctly held that the trial court erred in admitting evidence of prior bad acts to show the victim's state of mind at the time of the threat and erred in instructing the jury to consider the prior bad acts to assess the victim's credibility. *State v. Magers*, noted at 134 Wn. App. 1061, 2006 Wash. App. LEXIS 1967. The court correctly recognized the limited scope of exceptions to ER 404(b) evidence and the risk of this type of evidence prejudicing the right to a fair trial unless precautions are taken. In overruling the Court of Appeals, the majority's approach allows the exceptions to swallow the rule. The proper approach is to maintain narrow exceptions. "A trial court must always begin with the presumption that evidence of prior bad acts is inadmissible." *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). That is what ER 404(b) expressly commands. Admissibility should be allowed only after recognizing that one of the narrow exceptions applies and that protections are in place and where the trial court balances the probative value of the evidence carefully with its prejudicial effect.

¶55 In this case, the trial court found, under what the judge believed to be the controlling precedent of *State v. Grant*, 83 Wn. App. 98, 920 P.2d 609 (1996), that Magers's previous convictions and prior violent history had great probative value to the extent that the evidence explained the dynamics of the domestic violence relationship and why

the victim was giving inconsistent statements. Report of Proceedings at 178-80. In *Grant*, the trial court found that evidence of prior assaults by the defendant against the victim was more probative than prejudicial and allowed this evidence to come in as part of the *defendant's* testimony.[4] Generally, this type of evidence is allowed only to help prove the act in question actually occurred, but the trial court here found it was admissible under ER 404(b) to assess the *victim's* credibility. Where evidence is used to assess credibility rather than used to prove the act was done under ER 404(b), the evidence is certainly less relevant and should weigh significantly less in the trial court's balancing test. This type of evidence is highly prejudicial, and its admission at trial should be allowed only in the narrowest set of circumstances.

¶56 The court in *Grant* noted that "[e]xpert testimony would have shown that the consequences of domestic violence often lead to seemingly inconsistent conduct on the part of the victim"; however, it failed to require this step be taken. *Grant*, 83 Wn. App. at 109. In domestic violence cases, an expert witness can objectively explain the dynamics of the violent relationship and, taken with all the evidence, would allow the jury to decide if this type of relationship actually existed in each case and explain why there may be inconsistencies in the victim's testimony. The expert's testimony then establishes the probative value of the prior violence between the defendant and the victim, in that the victim, based on the nature of the abusive relationship, will often change their story. Only then may a trial judge properly conduct the ER 404(b) balancing test on the record. It is not self-evident why a victim involved in an abusive relationship may often change their testimony; expert testimony is necessary to establish why, in the context of the victim's relationship with the defendant,

---

[4] The Court of Appeals in *Grant* held that although these prior bad acts may not have been admissible under ER 609(a) as found by the trial court, they were admissible under ER 404(b) and thus any error in admission was harmless. *Grant*, 83 Wn. App. 98.

these inconsistencies may exist. Without these safeguards giving proper weight to the victim's inconsistent statements, the reasoning of the majority here could apply to a broad range of assault cases where a victim may give inconsistent statements. Because the reason for admitting the evidence was primarily to explain inconsistent statements of the victim, without the trial court first establishing a domestic violence relationship existed, the admission of prior bad acts under ER 404(b) was in error.

¶57 A defendant is on trial only for actions taken in the current case, not for wrongful acts that may have occurred in the past. ER 404(b) has historically been a mechanism to ensure that the jury convicts a defendant based only on evidence proving the commission of the crime charged. A person should not be convicted based on being the type of person who is likely to commit crimes. The State is required to prove, beyond a reasonable doubt, that *this person* committed *this crime.* The Washington Constitution ensures this by guaranteeing criminal defendants a fair and impartial trial; inherent in this right is the presumption of innocence and that their guilt be proved beyond a reasonable doubt. CONST. art. I, §§ 3, 22. By generally allowing admission of highly prejudicial evidence of prior bad acts to be admitted at trial, the jury has a much higher likelihood of convicting an innocent defendant because of other crimes or bad acts committed in the defendant's past. ER 404(b) protects against this type of prejudicial and biased trial.

¶58 I agree with the majority that defendant's prior acts of domestic violence involving the defendant and the crime victim may, in some cases, be properly admissible to assist the jury in assessing the victim's credibility; however, the majority fails to require necessary safeguards. Before this type of evidence is admitted, expert testimony should be required to explain to the jury the distinct dynamics of a domestic violence relationship. Further, we have always been explicit in our requirement that a probative versus prejudicial balancing test should be conducted on the record before allowing admission of prior bad acts. *State v. Wade,*

138 Wn.2d 460, 463, 979 P.2d 850 (1999) ("The court must determine the purpose of the evidence, find the evidence to be materially relevant, and balance its probative value against the potential for unfair prejudice." (citing *Saltarelli*, 98 Wn.2d at 362)). We should continue to emphasize the constriction of any exception to ER 404(b).

¶59 The balancing test must be thoughtfully and carefully conducted on the record, and if there is any doubt as to its admission, the scale should be tipped in favor of the exclusion of evidence. Admission of this type of evidence should be allowed only guardedly and only in a narrow set of circumstances after careful consideration. The majority unfortunately disregards the cautionary instructions from our previous cases.

## Conclusion

¶60 The Court of Appeals should be affirmed and any evidence of prior bad acts should not be admitted to assess the victim's credibility at trial unless the State has established the existence of a domestic violence relationship through the use of expert testimony and the trial court conducts an ER 404(b) probative versus prejudicial balancing test on the record.

SANDERS and CHAMBERS, JJ., concur with C. JOHNSON, J.