# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                Respondent,

       v.

NEIL JAMES ROBERSON,

                Appellant.

DIVISION ONE

No. 84479-2-I

UNPUBLISHED OPINION

DWYER, J. — Neil Roberson appeals from the judgment entered on a jury's verdicts finding him guilty of seven charges: (1) rape of a child in the second degree, (2) attempted rape of a child in the second degree, (3) indecent exposure, (4) child molestation in the second degree, (5) voyeurism, (6) tampering with a witness, and (7) dealing in depictions of a minor engaged in sexually explicit conduct. Roberson was sentenced to a minimum term of 574 months of incarceration with a maximum of life.

On appeal, Roberson first asserts that the trial court erred by not administering an oath to a witness before she testified, thereby violating his constitutional right to due process. Although he did not then object, Roberson avers that the error was manifest and prejudicial to him. Roberson next asserts that the trial court erred by admitting numerous Snapchat text messages that he contends did not qualify as present sense impressions (the trial court's stated

basis for admission). He also contends that he received ineffective assistance of counsel because his attorney did not object to the admission of certain text messages that suggested Roberson's affinity for child pornography.

The witness oath requirement is a vital trial requirement that underlies each testifying participant's commitment to tell the truth or suffer legal consequences for not so doing. A failure to administer an oath threatens the defendant's right to due process. Washington courts have seriously regarded this legal ritual. Here, however, a conflict of fact in the trial record creates uncertainty as to whether the claimed error actually occurred. Thus, appellant has not established that the purported failure to administer the witness oath qualifies as a manifest error. Accordingly, review of this claim of error is not warranted pursuant to RAP 2.5(a).[1]

We affirm the trial court's admission of most of the the challenged Snapchat text messages from one of the victims, T.H., to her friend H.K. under the present sense impression exception to the hearsay rule. As to the other challenged messages, we deem the error in their admission to be harmless. Roberson's claim of ineffective assistance of counsel also fails.

The State concedes that remand is appropriate to strike the victim penalty assessment and to correct the memorialization of one of the crimes of conviction

---

[1] RAP 2.5(a) states in part:
**Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: (1) lack of trial court jurisdiction, (2) failure to establish facts upon which relief can be granted, and (3) manifest error affecting a constitutional right.

listed in the judgment and sentence, which was listed as rape instead of attempted rape.

Lastly, Roberson submits a statement of additional grounds asserting numerous claims for review. We deny Roberson's request for appellate relief on each of the grounds set forth therein.

I

As determined by the jury, there are two victims in this case. In the summer of 2018, T.H. was 13 years old and H.M. was 14 years old. At the time of trial, they were 17 and 19 years old, respectively. T.H. and H.M. were good friends. H.M. lived with her mother, Rebecca, and her mother's boyfriend, Neil Roberson. Rebecca and Roberson had been dating since early 2017. Because T.H.'s mother worked long hours as a waitress, T.H. often stayed at H.M.'s house. The girls did not have school during the summer, and, therefore, T.H. was at H.M.'s house frequently, often sleeping there overnight.

T.H. testified that Roberson started to touch her in an inappropriate way on the days that she was at H.M.'s house during the summer of 2018. He would touch her on her lower back and get very physically close to her. T.H. testified that he also asked her to put her head on his lap.

On one occasion, T.H. and H.M. were sitting in H.M.'s upstairs bedroom and saw Roberson masturbating in his bedroom across the hallway. T.H. testified that the bedroom door was open and they could see that he was masturbating. H.M. also testified that she had seen Roberson masturbating from the vantage point of her bedroom.

3

On another occasion, a naked Roberson walked past T.H. and H.M. and up the stairs to the second story of the house. While upstairs, Roberson texted T.H. and asked her to go upstairs. T.H. did not do so. Roberson also texted H.M. and asked her to tell T.H. to go upstairs. Later, Roberson said to T.H., "You should have came upstairs; I just wanted to see some tail."

T.H. sometimes borrowed Roberson's cell phone and was able to see his Facebook messages. In one such message, T.H. saw that Roberson had taken photos of her and H.M. in their swimsuits at an angle accentuating their legs and buttocks, and had sent the photo to his friend Jason Chandler.

T.H. testified that Roberson sexually assaulted her several times in late July 2018. One night, T.H. was sleeping in the living room. She awoke to find Roberson touching her all over her body. He then began to rub his penis on T.H.'s face and along her lips. At this time, Roberson was masturbating and he ejaculated on her face. On another night when T.H. was sleeping, she awakened to Roberson positioning her body so as to penetrate her vagina with his finger. On both of these occasions, T.H. pretended to be asleep. She testified that she was afraid and did not know what else to do.

During the early hours of July 26, T.H. testified, she was sleeping on the couch in the living room. T.H. woke up when Roberson began to touch her body, but she pretended to be asleep. Roberson pulled her shorts aside and was rubbing his penis over her crotch and then tried to penetrate her vagina. T.H. was menstruating and was using a tampon. When Roberson realized she had a tampon inserted, he stopped and left the room.

Later in the morning of July 26, T.H. sent her friend H.K. a message, writing, "i was raped neil fucking raped me raw," "i'm shaking rn [right now]," "and i had a tampon in." T.H.'s long message to H.K. continued and the text was admitted in a series of exhibits.[2] The messages described the attempted rape in detail.

On July 29, T.H. sent another Snapchat message to H.K., describing other incidents. T.H. testified that she sent the message while she was "still in shock, processing, not knowing what to do" in the days after the attempted rape. T.H. described how Roberson had been in his bedroom, visibly masturbating and that Roberson had told her that if she wanted to smoke marijuana with him, she would have to let him touch her.

On August 1, T.H. was sleeping in the downstairs bedroom, in the same bed as H.M. with the door locked. In the middle of the night, T.H. woke up and saw Roberson in the room. Again, T.H. pretended to be asleep. She testified that she did this because she was afraid and because she was a 13-year-old girl and Roberson was a 33-year-old man and she was in his house. Roberson moved T.H.'s underwear to the side and penetrated her vagina and her anus with his penis. H.M. was heavy sleeper and slept through this encounter between T.H. and Roberson. At one point during the assault, H.M. started to move in her sleep. Roberson then stopped touching T.H. and left the room.

On the morning of August 2, T.H. went to the hospital, accompanied by H.K., and was examined by Sexual Assault Nurse Rebecca Peace. At trial,

---

[2] Exhibits 169, 170, 171, 172, and 172A.

Peace testified that T.H. had redness around her anus and an abrasion on her labia that was consistent with sexual assault.

An employee at the hospital emergency room called the police. Officer Mike Don responded. Officer Don testified that he obtained a search warrant for Roberson's residence and his "person" (for DNA). Officer Don testified that "while the officers were knocking on the door, I could see people sitting in the garage." Officer Shackleton, who accompanied Officer Don, testified that the garage door had been "partially up," so Officer Don had "made contact with the folks inside." There, Officer Don saw Roberson and H.M. sitting and smoking marijuana.

Inside the house, the officers recovered evidence, including the clothes that T.H. and Roberson had been wearing at the time of the rape, as well as digital devices, computers, and laptops. The clothing was collected for DNA evidence and the electronic devices were examined forensically.

Snapchat messages between T.H. and H.K. were discovered on the cell phones and computers. Forensic investigators also discovered Facebook messages between Roberson and Chandler, as well as with a person identified as Mike. In these messages, Roberson had sent photographs of T.H. and H.M. in swimsuits, as well as a nude video of H.M. The messages were admitted into evidence.

Roberson was initially arrested for the sexual assaults on T.H. However, during an interview with police, H.M. reported that Roberson had also been touching her in a sexual way.

At trial, H.M. testified[3] that often when she went into the shower Roberson would enter the bathroom, put his hand around the closed shower curtain and touch her on her lower back and bottom. Roberson did this more than one time and did not stop doing it until he was arrested. H.M. testified that she did not know that Roberson had videotaped her while she was nude and inside the bathroom until the trial began.

After his arrest, Roberson began to call H.M.'s mother from jail. In these calls, he asked Rebecca to convince H.M. to submit a letter recanting her allegations against Roberson. To facilitate this, he sent Rebecca a letter for H.M. to copy in her own handwriting. Rebecca showed H.M. the letter written by Roberson and convinced her to recant her accusation against him, just as he had asked. H.M. copied the letter and Rebecca took her to a notary to sign the letter and have it notarized. On September 17, 2018, H.M. submitted her recantation letter to the prosecutor's office. On October 5, 2018, Rebecca was arrested for witness tampering.

Trial commenced on October 31, 2022 and lasted for nine days. T.H., H.K., Rebecca, and Roberson testified. H.M. was also called as a witness.

During motions in limine and throughout the trial, the attorneys discussed exhibits 167-175, which included Snapchat messages from T.H. to H.K. The messages described Roberson's assaults and rape, as well as the previous incidents of Roberson's indecent exposure. Defense counsel objected to their admission on the basis of hearsay. Defense counsel argued that the messages

---

[3] Roberson asserts that H.M. was never administered an oath before testifying. We address this claim of error in Section II, infra.

7

proposed for admission were only screenshots (photographs of conversations) of a text conversation that had happened in the past and that they did not express a current state of mind. Defense counsel argued that the messages were different from situations in which the declarant blurted out their feelings or called 911 while still in a state of shock. This was so, defense counsel argued, because T.H. had to deliberately open her phone and use motor skills to type a message. Defense counsel also argued that the admission of the messages would be unfairly prejudicial to Roberson.

The State disagreed, contending that the photos and screenshots were present sense impressions, given the proximity in time between the actions described and the message sent, and because T.H. wrote that she was "still shaking" as she described what had happened.

Both of the participants in the Snapchat conversations, T.H. and H.K., were scheduled to testify at trial. Therefore, the trial judge decided that, during their testimony, the messages could first be simply identified in the context of when they were sent. Attorneys could ask T.H. what she was thinking during the message exchange, after which time the trial judge would rule on their admissibility.

After T.H.'s testimony, the trial judge ruled that the messages were admissible as present sense impressions.

Roberson testified, admitting that he had taken the nude video of H.M. and sent it to Chandler. He also admitted having other photos of T.H. and H.M. stored on his cell phone. Roberson claimed that T.H. and H.M. had his password

8

and that they were "constantly taking pictures of themselves," and that he did not know how the photographs got on his phone. Roberson further admitted masturbating while his bedroom door was partially open while the girls were in the home. He also admitted walking through the house naked in front of the girls. He additionally admitted going to the downstairs bedroom on August 1 (to use the bathroom and feed his parrot) while the girls were sleeping there. He denied touching H.M. while she was in the shower. He denied both the attempted rape and the rape of T.H.

Roberson stipulated to having been convicted of indecent exposure with sexual motivation in the past.

H.M. testified that she had agreed to copy the recantation letter and submit it because she thought it would help her and her mother. H.M. further testified that what was written in the letter was not true but, rather, that what she was saying in court that day was true—that Roberson had been improperly touching her in the bathroom and that she had seen him masturbating and walking naked inside the house.

The trial concluded on November 10, 2022. The jury returned with a verdict of guilty on all counts. Roberson appeals.

II

Roberson first asserts that the trial court failed to administer an oath to H.M. prior to her testimony. This, he asserts, constitutes a violation of his constitutional due process rights. But Roberson never called the matter to the attention of the trial judge. Accordingly, he may not assert the claim of error

unless he can establish that it meets the standard of a "manifest error affecting a constitutional right." See RAP 2.5(a)(3). Because he cannot do so, his assertion of error was waived and it is not subject to our review.

A

A party may raise a claim of error for the first time on appeal if the asserted error qualifies as a "manifest error"[4] affecting a constitutional right. RAP 2.5(a)(3). The appellant first has the burden of showing that the error was of constitutional dimension and that the error was manifest. State v. Grimes, 165 Wn. App. 172, 185-86, 267 P.3d 454 (2011). The exception for a manifest error is narrow, affording review only of "'certain constitutional questions.'" State v. Lynn, 67 Wn. App. 339, 343, 835 P.2d 251 (1992) (internal quotation marks omitted) (quoting State v. Scott, 110 Wn.2d 682, 687, 757 P.2d 492 (1988)); see also State v. WWJ Corp., 138 Wn.2d 595, 603, 980 P.2d 1257 (1999). To be manifest, a showing of actual prejudice is required. State v. Walsh, 143 Wn.2d 1, 8, 17 P.3d 591 (2001) (citing State v. McFarland, 127 Wn.2d 322, 333-34, 899 P.2d 1251 (1995)). "'Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case.'" WWJ Corp., 138 Wn.2d at 603 (quoting Lynn, 67 Wn. App. at 345).

---

[4] "Manifest" in this context means that which is "[c]lear; obvious; unquestionable." BLACK'S LAW DICTIONARY 1152 (11th ed. 2019). Regarding manifest error, State v. McFarland explains, "[a]s an exception to the general rule, . . . RAP 2.5(a)(3) is not intended to afford criminal defendants a means for obtaining new trials whenever they can identify some constitutional issue not raised before the trial court. Rather, the asserted error must be 'manifest'—i.e., it must be 'truly of constitutional magnitude.'" 127 Wn.2d 322, 333, 899 P.2d 1251 (1995) (quoting State v. Scott, 110 Wn.2d 682, 688, 757 P.2d 492 (1988)).

"If the trial record is insufficient to determine the merits of the constitutional claim, the error is not manifest and review is not warranted." State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007) (citing WWJ Corp., 138 Wn.2d at 602; McFarland, 127 Wn.2d at 333).

B

Here, the trial record is insufficient to determine whether the alleged judicial error actually took place.

Roberson factually bases his claim on the trial transcript. The offered trial transcript reports that all trial witnesses, except for H.M., were "duly sworn" before testifying.[5] From this, Roberson asserts that no oath was administered to H.M.

On the other hand, the transcript also includes a statement of the trial judge, following a break in H.M.'s testimony:

> [H.M.], you have been previously sworn. You are . . . still under oath. [Counsel], your witness as to continuing cross examination.

Moreover, and significantly, the clerk's minutes include a notation that H.M. was sworn in before testifying, chronicled by the entry: "[H.M.], called by State, is sworn and testifies."

Both parties agree that the matter was not addressed at trial. Both the clerk's minutes and the offered trial transcript are presumptively reliable indicators of that which took place. But here they are in conflict.

---

[5] The transcription of the trial proceeding shows that oaths were given to: Sergeant Aaron McIntosh, Sergeant Mike Don, Rebecca Peace, T.H., Mariah Low, Dr. Kirk Brownell, Detective Wayne Jones, Rebecca McKee, H.K., Officer Wyatt Livingston, Lieutenant Dave Shackleton, and Neil Roberson.

11

On this record, Roberson does not establish the existence of a manifest judicial error. Thus, the asserted claim was waived when he did not raise it in the trial court. RAP 2.5(a)(3); see Scott, 110 Wn.2d at 687-88.

III

Roberson's next claim of error concerns the admission of Snapchat messages pursuant to the present sense impression exception to the hearsay rule.[6] See ER 803 (a)(1).

The State avers that the text messages were admissible as present sense impressions, showing T.H.'s state of mind immediately following the attempted rape. The State contends the July 26 message could also be regarded as an excited utterance. The State concedes that two of these exhibits were improperly admitted as present sense impression because of the lapse in time between the event described and their creation, but argues that their admission was harmless error. All of these were admitted over defense objections.

A

We review evidentiary issues, including a trial court's determination that a hearsay exception applies, for an abuse of discretion. State v. Magers, 164 Wn.2d 174, 187, 189 P.3d 126 (2008); see also State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997). A trial court abuses its discretion if it improperly applies a rule of evidence. State v. Young, 160 Wn.2d 799, 806, 161 P.3d 967 (2007) (citing State v. Briscoeray, 95 Wn. App. 167, 171-172, 974 P.2d 912

---

[6] Exhibits 167, 167A, 169, 170, 171, 172, 172A, 173, 174, 175, 175A, 177, 177A. Several of the exhibits are exactly alike and several show overlapping segments of sentences that continue from one message to the next.

(1999)). An abuse of discretion occurs when the trial court's ruling is manifestly unreasonable or based on untenable grounds or reasons. State v. Garcia, 179 Wn.2d 828, 844, 318 P.3d 266 (2014). We may affirm the trial court on "any correct ground." State v. Gresham, 173 Wn.2d 405, 419, 269 P.3d 207 (2012).

B

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay evidence is inadmissible unless an exception applies. ER 802. ER 803 provides exceptions to the hearsay rule.

ER 803(a)(1) provides one such exception for present sense impressions. A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." ER 803(a)(1).

ER 803(a)(2) sets forth the excited utterance exception. A statement qualifies as an excited utterance if (1) a startling event occurred, (2) the declarant made the statement under the stress or excitement of the event, and (3) the statement relates to the event. Magers, 164 Wn.2d at 187-88; see also Briscoeray, 95 Wn. App. at 173. When there is evidence that a declarant has intentionally fabricated statements, those statements are not excited utterances. State v. Brown, 127 Wn.2d 749, 757-58, 903 P.2d 459 (1995).[7]

_____

[7] The elements of these two exceptions—present sense impression and excited utterance—are based upon the explanation set forth in Beck v. Dye, 200 Wash. 1, 9-10, 92 P.2d 1113 (1939):

> (1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a

13

C

Here, the sets of exhibits at issue fall into three different categories corresponding to different events in the case:

1) messages sent from T.H. to H.K. on July 26, the morning after the attempted rape, describing the attempted rape in detail and T.H.'s feelings at the time;

2) messages sent from T.H. to H.K. on July 29, describing Roberson's indecent exposure (masturbation) from one or two weeks prior; and

3) a message sent from T.H. to H.K. on July 30 that references Roberson telling T.H.—in the same moment as her texts were being written—that she would need to do him favors to continue to smoke marijuana with him.

1

The first set of exhibits were segments of three text messages that T.H. sent to H.K. on July 26.[8] The exhibits were admitted as T.H.'s present sense impressions following the attempted rape.

---

past, completed affair; (3) it must be a statement of fact, and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation, and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made.

[8] The July 26 text messages were divided into seven exhibits: 167, 167A, 169, 170, 171, 172, and 172A.

Although the text messages were not sent contemporaneously with the attempted rape in the early hours of July 26, T.H. testified that they were sent "right away"—as soon as T.H. woke up later that morning.

In trial testimony, T.H. expressed that, in her first message to H.K., she "was still shaking." This referenced her text message that "i was raped neil fucking raped me raw i'm shaking." This text message was also admitted as an excited utterance.

T.H. then sent H.K. a screenshot of a message that Roberson had sent T.H. early that morning at 5:36 a.m. that read: "You're the best. Just saying."

In a third message to H.K., T.H. proceeded to describe the attempted rape in detail. The full text of this message follows:

> so last night i was really high like it's a total blur but so i pasted out i don't remember when but i woke up to neil groping my ass and i was laying on my tummy on the ground and then he thought i went back to sleep and he continued to grope my ass and then he dick came out and he was humping me and again the whole time i fell asleep and then he started spreading my legs apart he moved me as if i were puppet on strings and he started to go up my shorts and he started to like rub his dick just like in my pussy area in side my and then like [H.M.] started moving and so then he went back up stairs and then that's when i texted u first and again the whole time he thought i was asleep and then eventually he came back down and by that time I moved but i was still on the floor with my head leaning against the couch and he sat next to me and grabbed me and then i woke up a lil and he was all you were laying funny and i just looked confused and went back to sleep still in his arms and then he started to play with my boob and then he payed my down and started to put his dick in my face and like tried to like put it in my hand and get me to like do shit but again "i was sleeping" and like then he was all where do i cum but i didn't say anything cause I was asleep and like i don't even remember exactly what happened cause i was like still pretty buzzed but like i remember how fucking much i hated it omg i was so ducking like scared like his dick was out what all happened when i was actually asleep like idfk and like i

15

actually was shaking like while he was on me and i just don't even fucking know like i could get his ass in trouble and have everyone in my family feel bad for me my mom would be crying but I'd probably be aloud to do more stuff because she'd feel bad for me and then becky would be soo sooo upset and mad and his daughter would be destroyed cause that shit would fuck me up hella and like idk I just fucking wanna die

Roberson objected to the admission of the text messages, arguing that the messages had been sent several hours after a completed event, were products of thought and reflection, and therefore did not qualify as present sense impressions. Roberson also argued that they were photographs of conversations between two State witnesses and that their admission would have a prejudicial effect.

During trial, T.H. testified that she was "in shock" when she sent the messages and she confirmed that the texts were composed and sent soon after the incident. T.H. testified:

> Q: Okay. In relation to what that message described, how soon after the event did you send that message?
> A: I would say right away.
> Q: How were you feeling when you sent that message?
> A: In shock.
> Q: Were you still feeling the shock of what had occurred?
> A: Yes.
> Q: Why did you send that message to H.K.?
> A: Because I wanted to tell someone. I had to tell someone . . .
> Q: It says: I'm shaking rn. What does that mean?
> A: Right now.

Evidence was offered to prove the messages were sent in close proximity in time to the attempted rape. T.H.'s testimony regarding the timeline was corroborated by that of the computer and mobile forensic scientist and by H.K.'s confirmation of receipt and subsequent interaction with T.H.

16

The comments sent to H.K. were statements of fact rather than opinions. They appeared to be instinctive and spontaneous, not dominated by reflection, deliberation, or design, and they were not a mere narrative of a past, completed affair.  See Magers, 164 Wn.2d at 187-88; Beck v. Dye, 200 Wash. 1, 9-10, 92 P.2d 1113 (1939).  Evidence was also offered to establish that T.H. made the statements under the stress or excitement of the event at issue.

Accordingly, the exhibits were justifiably construed as present sense impressions and, as such, the trial court did not abuse its discretion by admitting them.

2

A second set of exhibits were messages that T.H. sent to H.K. on July 29, which describe Roberson masturbating in the bedroom with the door open, one or two weeks prior to the attempted rape.  The message says, in pertinent part:

> *So earlier* … u know how I was saying he was jacking off… so he kept telling me to come up stairs right and like that's why I called n shit but like he was trying to talk to us . . .

(Emphasis added.)

T.H. continued to describe the past situation in the message.  During trial, T.H. testified that she had still been under the stress of the July 26 attempted rape when she wrote the message on July 29.  However, in contrast to the July 26 message that described the attempted rape the next morning, this message described an event that transpired much earlier, with one or two weeks between the event and the message at issue.  Given this time lapse, the State concedes

17

that these messages were admitted improperly as present sense impression. However, the State further argues that the error was harmless. We agree.

When evidence is deemed to have been improperly admitted, a harmless error analysis may be undertaken. The erroneous admission of a text message is not a constitutional error, and, thus, is not subject to the stringent "harmless beyond a reasonable doubt" standard. See State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). Here, the error resulted from a violation of an evidentiary rule. Such an "error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected." Cunningham, 93 Wn.2d at 831; State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981); see also State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).

Here, in view of uncontroverted testimony that Roberson had been masturbating, the admission of these two exhibits cannot be seen as having affected the outcome of the trial. Testimony from T.H. and H.M. was presented at trial, with each of them testifying about Roberson masturbating within their view. Moreover, Roberson himself admitted that he had masturbated with the door open and T.H. and H.M. nearby.

Although the improperly admitted texts constituted hearsay and should not have been admitted, we deem the error harmless in light of the other testimonial evidence from firsthand witnesses describing Roberson's masturbatory acts of indecent exposure. No entitlement to appellate relief is established.

18

3

A third set of exhibits included a text message that T.H. sent to H.K. on July 30. In it, she described how Roberson told T.H. that if she wanted to smoke marijuana with him, she would need to comply with a request.

> neil just told me that if i want things and i wanna smoke with him i'm going to have to let him touch and get things from me and now he's getting me waffles cause i put my mouth on his put ["pipe"] wtf did he do to his pipe

> and now he's thanking ME for smoking with him because his ass thinks that he's gonna touch me

Roberson objected to the admission of this message on the same basis as the July 26 and July 29 messages, asserting that the message did not qualify as a present sense impression.

However, this text message was transmitted contemporaneously with T.H.'s interaction with Roberson, as T.H. describes that he "*just told me*" and "*now* he's thanking ME for smoking with him." (Emphasis added.) T.H. also testified to the time frame and the context of this message. This proximity in time and her physical proximity to Roberson, as well as her description of her impression of the situation, satisfies the requirements of the present sense impression exception.

The trial court did not abuse its discretion by admitting the message.

IV

Roberson next asserts that he received ineffective assistance of counsel because his attorney objected belatedly to the admission of exhibits suggesting Roberson's interest in child pornography. Roberson contends that the

19

conversations between Roberson and a person named Mike about child pornography were not related to any crime charged in the present case and, therefore, the exhibits were irrelevant and unfairly prejudicial. We hold that Roberson fails to establish an entitlement to relief on this claim.

A

We review a claim of ineffective assistance of counsel for abuse of discretion. The United States Constitution sets forth that "[i]n all criminal prosecutions, the accused shall . . . have the assistance of counsel for his defense." U.S. CONST. amend. VI. This right is not sufficient unless it is the right to "effective" counsel. McMann v. Richardson, 397 U.S. 759, 770-71, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970). The Washington Constitution affords a similar guaranty. WASH. CONST. art. I, § 22.

The United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), provides the governing standard for claims of ineffective assistance of counsel. "Constitutionally ineffective assistance of counsel is established only when the defendant shows that (1) counsel's performance, when considered in light of all the circumstances, fell below an objectively reasonable standard of performance and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." State v. Woods, 198 Wn. App. 453, 461, 393 P.3d 886 (2017) (citing Strickland, 466 U.S. at 687). Failure to establish either prong of the test ends the inquiry and is fatal to the claim of ineffective assistance of counsel. Strickland, 466 U.S. at 687; State v.

20

Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). The defendant bears the burden of demonstrating both deficient representation and resulting prejudice. In re Det. of Hatfield, 191 Wn. App. 378, 401, 362 P.3d 997 (2015).

"Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." McFarland, 127 Wn.2d at 336. "[T]he presumption of adequate representation is not overcome if there is any 'conceivable legitimate tactic' that can explain counsel's performance." Hatfield, 191 Wn. App. at 402 (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)); see also State v. Grier, 171 Wn.2d 17, 33-34, 246 P.3d 1260 (2011); State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). Prejudice is established when there is a reasonable probability that the outcome of the proceedings would have been different had counsel's performance not been deficient. McFarland, 127 Wn.2d at 337.

B

In order for Roberson to establish that his attorney's performance was deficient, he must show that (1) each decision not to object was not a legitimate strategic decision, (2) an objection would likely have been sustained, and (3) there is a reasonable probability that the jury verdict would have been different with a proper objection. In re Pers. Restraint of Davis, 152 Wn.2d 647, 714, 101 P.3d 1 (2004); State v. Saunders, 91 Wn. App. 575, 578, 958 P.2d 364 (1998).

It is a widely recognized trial tactic to withhold an objection in order to downplay or not highlight information presented by the opponent. State v.

Vazquez, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). The "reviewing court must consider what would likely have happened if the defendant had timely objected." State v. Emery, 174 Wn.2d 741, 763, 278 P.3d 653 (2012). Moreover, "'[o]nly in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" State v. Johnston, 143 Wn. App.1, 19, 177 P.3d 1127 (2007) (quoting State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989)).

C

Here, Roberson's attorney explained the tactical reasons why he did not initially object to the introduction of several text messages between Roberson and Mike, containing references to child pornography. He did not object to these exhibits, he explained, because he sought the admission of one exhibit in particular, exhibit 167, which consisted of a screenshot of a message from T.H. to H.K. In exhibit 166A, T.H.'s message included "neil has a gay friend," and "and they like child pornography." In exhibit 167, the assertion "and they like child pornography," was repeated. The line, "and they like child pornography" furthered Roberson's defense theory that T.H. had a motive to fabricate her allegations of rape. Roberson's attorney told the trial judge why he did not object to the exhibit being admitted:

> MR. WEISS: The primary thing is establishing that the discussion about child pornography occurred before the allegation of rape was made.
> THE COURT: How is that relevant?
> MR. WEISS: It goes into --
> THE COURT: I'm having trouble understanding how that is relevant to your case.

22

MR. WEISS: . . . The reason why that's relevant, Your Honor, is because it goes to state of mind and a potential defense argument that when this was discovered, like the video was discovered, that's when the allegation that she was raped came forward, and that was the motivation for her, potentially, making up this rape allegation.

Defense counsel conceded that if exhibit 167 was admitted, the State would need other exhibits (164 and 165) admitted to enable the State to provide the context under which the statement ("and they like child pornography") was made. Exhibits 164 and 165 displayed a series of text messages exchanged between Roberson and Chandler, in which they discussed how to find "kiddy porn" on a particular website. The State argued that if exhibit 167 was admitted as "some kind of bias or motive, as if the girls have reason to frame the defendant," then exhibits 164 and 165 were necessary to dispute that argument.

While all of these proposed exhibits were potentially disadvantageous to Roberson, defense counsel said he understood the State's position and agreed to the admission of all three exhibits. All three exhibits were admitted. Defense counsel did not object.

Roberson's attorney clearly explained that his decision to allow the admission of exhibits regarding child pornography was in order to argue a theory of motivation to falsely accuse Roberson of the crimes alleged.[9] Thus, here, the

---

[9] Later in the trial, however, defense counsel did belatedly object to the exhibits. He said that although he had not objected previously to the admission of exhibits 164 and 165, he had an objection at that point in the trial, explaining that: "[I]t came to my attention that those are the conversations with the person known as Mike. Initially, I thought those were the conversations with Mr. Chandler, and that was, I guess, something that we were still trying to determine at that time. With that being said, I'm asking that those not be admitted because they are conversations with someone that's not Mr. Chandler. And I know there's been other Snapchat posts that have been submitted. I don't think that these ones need to be submitted, because they are with this person named Mike, therefore, they are irrelevant." The court denied the request.

That the attorney's tactical decision did not prove fruitful does not alter the fact that it was tactical at the time it was made and that the admitted evidence was not central to the State's

"presumption of adequate representation is not overcome" given a "'conceivable legitimate tactic' that [could] explain counsel's performance." Hatfield, 191 Wn. App. at 402 (quoting Reichenbach, 153 Wn.2d at 130).

Roberson has not established that defense counsel's performance fell below an objectively reasonable standard of performance and that, but for the errors of his attorney, the outcome of the trial would have been different. While the messages suggested an interest in child pornography, they were not the central evidence submitted in support of the crimes for which he was charged: attempted child rape, child rape, child molestation, voyeurism, tampering with a witness, and dealing in depictions. For these charges, ample evidence was presented at trial to prove the allegations.

Accordingly, Roberson has not established ineffective assistance of counsel.

V

In regard to the supervision fees and the $500 victim penalty assessment imposed on Roberson, the State concedes that the trial court erred at sentencing when it assessed the fees against Roberson. Because Roberson was indigent at the time of sentencing, and remains indigent while on appeal, he is entitled to have the requirements vacated. State v. Ellis, 27 Wn. App. 2d 1, 530 P.3d 1048 (2023); LAWS OF 2023, ch. 449 §1; LAWS OF 2022, ch. 29, §7. On remand, we direct the trial court to do so.

---

case. Not all trial tactics prove advantageous as the case plays out. That a tactic proves unsuccessful does not render the tactician unconstitutionally deficient.

24

VI

The State concedes that the judgment and sentence incorrectly records the crime of conviction for count 2 as rape of a child in the second degree when, in fact, Roberson was convicted of attempted rape of a child in the second degree. On remand, the trial court should correct this error.

VII

Roberson submits a statement of additional grounds for review (SAG). Pursuant to RAP 10.10, a defendant may file such a document to raise, identify, and discuss those matters the defendant believes have not been adequately addressed by defense counsel. We will not, however, consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of the alleged errors, and we are not obligated to search the record for support of claims made in a defendant's statement of additional grounds. RAP 10.10(c).

Roberson raises numerous claims of error that may be grouped in the following 11 categories: (A) search warrants, (B) DNA collection and testing and crime lab error, (C) jury dismissal and bias, (D) witness tampering, (E) improper plea agreement, (F) pro se motion denials, (G) continuances and speedy trial violations, (H) over-charging, (H) ineffective assistance of counsel, (I) additional evidentiary issues, and (J) other allegations.

A

1

Roberson first argues that the search warrants that were issued authorizing the police to obtain digital records from Snapchat, Facebook, Apple, and Verizon expired, but the police continued to collect data past the date of expiration. Thus, Roberson avers, the exhibits used during the trial were warrantless and should have been excluded.

The search warrants at issue were not included in the record on review. Thus, this claim does not warrant appellate review or relief.

2

Roberson next asserts that police officers wrongly entered his residence by "simply announcing themselves and opening the garage door" without a no-knock warrant. SAG at 2. Roberson also contends that the search warrant was improperly served on a minor and not an adult, thereby rendering evidence collected there inadmissible and a violation of due process.

Once again, the search warrant for the residence was not included in the record for review. Roberson points to the trial transcript as a substitute for the necessary record, but nothing in the transcript fully describes the warrant, nor does it indicate who was provided with a copy of the warrant when the police arrived to execute the search. Moreover, Roberson does not provide authority indicating why the identity or age of the recipient would matter. Nevertheless, Roberson, an adult, was present and the officers spoke with him. The police had a right to enter the residence pursuant to the authority of the warrant.

Roberson's claim does not warrant appellate relief.

B

Roberson next asserts that particular materials containing DNA evidence were not tested by the crime lab (swabs from Roberson, T.H.'s rape kit, hair, linens) and that other samples were improperly handled (comingling of clothing, wrong pair of shorts sent to lab). He contends that the State failed to pursue potential exculpatory evidence by its failure to test certain samples. Roberson also claims that his defense attorney offered ineffective assistance of counsel by not questioning the forensic expert about asserted crime lab errors in more depth.

The exhibits containing the DNA evidence set forth by Roberson were not included in the record provided to this court, and we therefore cannot review the actions taken or assess any potential prejudice to Roberson.

The trial record reveals that Roberson's attorney did in fact raise concerns about and cross-examine witnesses concerning the DNA evidence handling and analysis. Indeed, defense counsel did so on several occasions during trial, both in and outside the presence of the jury. Defense counsel cross-examined the police officers who collected materials for DNA analysis (Officers Don and Shackleton), nurse Rebecca Peace, who examined T.H., and the State's forensic scientist, Mariah Low.

Low testified about the science of DNA testing, the results of the DNA analysis from samples taken from T.H. and Roberson, and about mistakes made by the crime lab. The record demonstrates that defense counsel took the

opportunity to question the veracity of the DNA evidence. Roberson does not establish his claim of ineffective assistance of counsel on this record.

As to Roberson's other assertions, we do not reweigh the evidence. This is a jury function. His claims fail.

C

Roberson next makes several assertions about the jury and describes events during jury selection and at trial that he suggests tainted its integrity. He provides no support for these contentions. In particular, Roberson does not establish that one juror seeing him being escorted from the courtroom, or that a juror's familiarity with the prosecutors, resulted in biased jury deliberations.

Roberson also contends that the trial court erred in its handling of juror 6. Juror 6 alerted the judge that she suspected sign language communication between the witness, H.M., and someone sitting in the courtroom. Juror 6 was later dismissed for discussing this concern and the case with another juror in the courthouse parking lot. On appeal, Roberson contends that the trial court should have also dismissed the other juror.

The record demonstrates that the trial court assessed this situation by interviewing all participants: juror 6, the juror with whom she spoke, and H.M. During discussion with the attorneys, the trial judge expressed concern that juror 6 had violated the judge's instruction not to discuss her suspicion of H.M.'s sign language communication or the case with another juror, and that juror 6 had violated this instruction within minutes after leaving the courtroom. The State agreed to juror 6's dismissal. Defense counsel objected to the dismissal of any

jurors, preferring that the trial court instead repeat its instruction to not discuss the case with others. Defense counsel said, however, that he understood the judge's position.

The trial judge dismissed juror 6 but decided that there was no reason to dismiss the other juror, given the brevity of the exchange and limited content of the conversation.

Roberson provides no evidence that the situation resulted in biased jury deliberations. These claims do not warrant appellate relief.

D

Roberson next questions the witness tampering charge, alleging that the charge was improper because his authorship of a rough draft of a statement for H.M. to sign does not constitute a crime.

RCW 9A.72.120 provides that a person is guilty of tampering with a witness if he or she attempts to induce a witness or person that he or she has reason to believe is about to be called as a witness in any official proceeding, or a person whom he or she has reason to believe may have information relevant to a criminal investigation to testify falsely, withhold testimony, or withhold information relevant to a criminal investigation.

Given this statutory definition, evidentiary support for the charge was sufficiently entered into the record through the testimony of H.M. and her mother Rebecca. Furthermore, Rebecca testified to the jail calls Roberson made to her and described the substance of the conversations, which established inducement. Roberson's claim does not warrant appellate relief.

E

Roberson next seeks to challenge the plea agreement made between Rebecca and the State regarding custody of H.M. A plea agreement is made between the prosecutor and the defendant. "The court shall not participate in any discussions under this section." RCW 9.94A.421. The plea agreement at issue is not included in the record for review. Moreover, review of plea agreements involving parties other than Roberson is outside the scope of this appeal. Roberson fails to show how that plea agreement impacted the integrity of his trial. Roberson again fails to demonstrate an entitlement to appellate relief.

F

Roberson next contends that trial court erred by dismissing Roberson's pro se motion to dismiss, motion to obtain bills of particulars, motion requesting testing of DNA evidence, motion of judicial notice, and a habeas corpus motion. Roberson complains that the trial court did not provide reasons for the dismissals and that he was not present for the dismissals.

Roberson hypothesizes that the court dismissed his motions because he was acting under hybrid representation, stating, "this is only a guess due to getting no responses" or explanation from the court. SAG at 11. Roberson avers that he filed the motions pro se during the five days when was not represented by counsel, between December 13 and December 17, 2021. Therefore, he argues, his motions were not filed during hybrid representation.

Roberson does not inform this court of the nature of alleged errors other than to challenge the fact that his requests were denied. Additionally, the pro se

motions themselves are not included in our record.  For both of these reasons, we are unable to review them.  No appellate relief is warranted.

G

Roberson next asserts that his right to a speedy trial was violated in 2021 during the COVID-19 pandemic and court shutdowns.  He claims that he objected to the delays in pro se motions in 2021, although these pro se motions are not provided in the record.[10]  Here again, on appeal, he alleges that the trial court erred by denying him a speedy trial, by not obtaining his permission to continue his trial dates on two occasions, and by not allowing him to be present and heard during critical moments of his case.

1

The right to a speedy trial is protected by the federal and state constitutions,[11] and we apply the same analysis under both.  State v. Ollivier, 178 Wn.2d 813, 826, 312 P.3d 1 (2013). If a defendant's right to a speedy trial is violated, the charges must be dismissed with prejudice.  State v. Iniguez, 167 Wn.2d 273, 282, 217 P.3d 768 (2009).

To determine whether the constitutional right to a speedy trial has been violated, we use the balancing test set forth in Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).  Ollivier, 178 Wn.2d at 827.  The test is fact-specific and "dependent upon the peculiar circumstances of the case." Barker, 407 U.S. at 530-31.  We consider the conduct of both the prosecution

---

[10] Roberson refers to Index 168.  This index is not included in the record. Roberson also refers to Index 107, and to a court document that purportedly notes "Declarant addresses court re: concerns with speedy trial." This index and that document are also not included in the record.

[11] U.S. CONST. amend VI; WASH. CONST. art. I, §22.

and the defense, and we weigh nonexclusive factors including the "'[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" Ollivier, 178 Wn.2d at 827 (alteration in original) (quoting Barker, 407 U.S. at 530). To show that a defendant's constitutional right to a speedy trial has been violated, a defendant ordinarily must establish actual prejudice. Ollivier, 178 Wn.2d at 840. Prejudice in the form of impairment to the defense is most important "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Barker, 407 U.S. at 532.

Here, Roberson's trial was delayed due to the COVID-19 pandemic and consequent court shutdowns, as well as his change of counsel. The record suggests that the uniquely historic reasons for the delays were outside the control of the attorneys. Moreover, Roberson has not provided proof that these continuances prejudiced the outcome of his case or his ability to prepare a defense.

2

(a)

CrR 3.3 governs time for trial requirements. The plain and unambiguous language of CrR 3.3 prohibits dismissal of criminal charges due to trial delay unless the defendant can demonstrate violation of the rule, a statute, or the state or federal constitution. CrR 3.3(h). The rule provides that when a charge is not brought to trial within the time limits set forth therein, that charge "shall be dismissed with prejudice." CrR 3.3(h). However, "this procedural right is not self-

executing and requires that a motion be filed to exercise it in accordance with the procedure outlined in the rule." State v. Walker, 199 Wn.2d 796, 804, 513 P.3d 111 (2022). Pursuant to the rule, "[a] party who objects to the date set upon the ground that it is not within the time limits prescribed by this rule must, within 10 days after the notice is mailed or otherwise given, move that the court set a trial within those time limits." CrR 3.3(d)(3).

CrR 3.3(d) provides the methods to challenge a violation of the time-for-trial rule:

> (2) *Resetting of Trial Date.* When the court determines that the trial date should be reset for any reason, including but not limited to the applicability of a new commencement date pursuant to subsection (c)(2) or a period of exclusion pursuant to section (e), the court shall set a new date for trial which is within the time limits prescribed and notify each counsel or party of the date set.

> (3) *Objection to Trial Setting.* A party who objects to the date set upon the ground that it is not within the time limits prescribed by this rule must, within 10 days after the notice is mailed or otherwise given, move that the court set a trial date within those time limits. Such motion shall be promptly noted for hearing by the moving party in accordance with local procedures. A party who fails, for any reason, to make such a motion shall lose the right to object that a trial commenced on such a date is not within the time limits prescribed by this rule.

Excluded periods in computing the time for trial includes:

> (3) *Continuances.* Delay granted by the court pursuant to section (f).
> . . . .
> (8) *Unavoidable or Unforeseen Circumstances.* Unavoidable or unforeseen circumstances affecting the time for trial beyond the control of the court or of the parties. This exclusion also applies to the cure period of section (g).

CrR 3.3 (e).

(b)

Here, the trial dates were delayed due to COVID-19 restrictions in the courts at the time and orders issued by the Washington State Supreme Court and the Skagit County Superior Court.  Moreover, Roberson's own defense counsel moved for the continuances and the record suggests that Roberson agreed to them.

Roberson was arraigned on August 16, 2018.  The matter proceeded without issue through most of 2021.

On February 19, 2021, a Washington State Supreme Court Emergency Order was issued that stated:

> a.  *Defense counsel is not required to obtain signatures from defendants* or respondents on orders to continue criminal or juvenile offender matters consistent with this order. *An attorney's signature on an order to continue constitutes a representation that the client has been consulted and agrees to the continuance, and courts shall allow attorneys to waive their clients' presence unless their presence is deemed necessary by the court.*
> b.  Courts shall provide notice of new hearing dates to defense counsel and unrepresented defendants.
> c.  Defense counsel shall provide notice to defendants and respondents of new court dates.

(Emphasis added.)

On September 9, 2021, the trial date was changed to September 27, 2021.  An e-mail sent at 8:16 a.m. confirmed that Roberson's attorney, Sharon Fields, told the prosecutor not to strike the date from the calendar until she was able to speak with Roberson.  The order with the new court date was entered over two hours later at 10:56 a.m.  The continuance was agreed to by the parties. The following box was checked on the September 9 order:

> Attorney for defendant confirms that s/he has communicated
> directly with the defendant and has advised the defendant of the
> court dates herein.

Fields signed the order.

On September 21, 2021, the Skagit County Superior Court entered an emergency order suspending all jury trials due to COVID-19. The order directed that all trial dates be stricken and rescheduled. On September 22, 2021, the prosecutor e-mailed Fields and asked:

> Can we strike [Roberson] from tomorrow's calendar? We'll need a
> FEBRUARY date…. Wayne Jones is out for all of January.

Fields responded:

> I talked to [Roberson] today. He understands (not real happy -
> speedy trial and all) and does NOT want to come down tomorrow.
> He has agreed that I just get the dates.

Fields' detailed notes of billable hours and jail log entries also document her meetings with Roberson prior to entry of the continuance orders.

On September 23, 2021, trial confirmation was set for February 7, 2022. Fields checked the box confirming that she had communicated directly with the defendant and had advised him of the court dates. Fields signed the order.

On December 13, 2021, Attorney Fields withdrew from Roberson's case. On December 17, 2021, Attorney Jason Weiss entered a notice of appearance.

On June 16, 2022—almost nine months after the second trial continuance on September 23, 2021—Roberson filed a motion to dismiss for due process violations through his new attorney, Jason Weiss, asserting that his prior defense attorney had entered two continuance orders, on September 9 and September

35

23, 2021 without his presence, permission, and signature. Roberson was in custody at the time.

On July 5, 2022, the prosecutor filed a response to the motion to dismiss.[12]

On October 11, 2022, a motion hearing was held, at which Roberson addressed the court concerning his motion to dismiss. An order filed on the same date denied the motion to dismiss, noting that there was "no basis for mismanagement or misconduct." The findings of fact and conclusions of law and final order denying the motion was filed on October 24, 2022.

On October 31, 2022, trial commenced.

In light of the COVID-19 emergency orders and the attorney actions throughout 2021-2022, the record indicates no denial of a constitutional or court rule right. Based on the evidence presented, the trial court did not err in granting the continuances and did not by so ruling violate Roberson's constitutional right to a speedy trial or his CrR 3.3 time for trial right.

3

Roberson also asserts that he received ineffective assistance of his pretrial counsel when attorney Fields agreed to the continuances on September 9 and September 23, 2021. As set forth above, we disagree.

---

[12] On July 5, 2022, the prosecutor's response to Roberson's motion to dismiss cited to Washington cases upholding the legitimacy of the emergency orders, including In re Dependency of J.D.E.C., 18 Wn. App. 2d 414, 491 P.3d 224 (2021) (upholding specifically the Skagit County emergency orders and procedures), In re Recall of Inslee, 199 Wn.2d 416, 508 P.3d 635 (2022) (upholding the Governor's limitation on how many people could attend a single gathering in response to a Constitutional Right of Assembly challenge), and Gonzales v. Inslee, 21 Wn. App. 2d 110, 504 P.3d 890 (2022) (upholding the Governor's emergency proclamations with respect to eviction moratoriums against a Constitutional illegal taking challenge), aff'd, 2 Wn.3d 280, 535 P.3d 864 (2023).

Regarding the filings that are included in the record, we do not find that Roberson received ineffective assistance of counsel from attorney Fields. The attorney's conduct was reasonable given the context of the COVID-19 restrictions at the time, the orders issued by the Washington State Supreme Court and the Skagit County Superior Court, and the need for trial preparation.

H

Next, Roberson challenges several of the convictions, alleging that the State did not adduce sufficient evidence to prove that his actions were undertaken for sexual gratification.

Roberson was charged and convicted of indecent exposure (second or subsequent offense and/or prior sex crime) – with a sexual motivation enhancement, charged in connection with T.H.'s and H.M.'s observation of his open-door masturbation. The special allegation – sexual motivation statute reads as follows:

> (1) The prosecuting attorney shall file a special allegation of sexual motivation in every criminal case, felony, gross misdemeanor, or misdemeanor, other than sex offenses as defined in RCW 9.94A.030 *when sufficient admissible evidence exists, which, when considered with the most plausible, reasonably foreseeable defense that could be raised under the evidence, would justify a finding of sexual motivation by a reasonable and objective fact finder.*

RCW 9.94A.835 (emphasis added).

There was sufficient evidence presented at trial through testimony and admitted evidence to demonstrate sexual motivation on this count.

37

Roberson was also charged and convicted of voyeurism in the first degree, charged in connection with Roberson's filming of H.M. in the nude. This crime is committed when:

> (2)(a) A person commits the crime of voyeurism in the first degree if, *for the purpose of arousing or gratifying the sexual desire of any person*, he or she knowingly views, photographs, or films:
> (i) Another person without that person's knowledge and consent while the person being viewed, photographed, or filmed is in a place where he or she would have a reasonable expectation of privacy; or
> (ii) The intimate areas of another person without that person's knowledge and consent and under circumstances where the person has a reasonable expectation of privacy, whether in a public or private place.

RCW 9A.44.115 (emphasis added).

There was sufficient evidence presented at trial through testimony and admitted evidence to demonstrate sexual motivation concerning Roberson's secretive filming of a naked minor girl in her bathroom..

Roberson was also charged and convicted of dealing in depictions of minor engaged in sexually explicit conduct in the second degree, brought in connection with Roberson sending photographs of T.H. and H.M. and a nude video of H.M. to his friend Chandler. This crime is committed when the defendant:

> (i) Knowingly develops, duplicates, publishes, prints, disseminates, exchanges, finances, attempts to finance, or sells any visual or printed matter that depicts a minor engaged in an act of sexually explicit conduct as defined in RCW 9.68A.011(4) (f) or (g);

RCW 9.68A.050(2)(a). The crime is sexually motivated when:

38

(f) Depiction of the genitals or unclothed pubic or rectal areas of any minor, or the unclothed breast of a female minor, *for the purpose of sexual stimulation of the viewer*. . . .

RCW 9.68A.011(4) (emphasis added).

There was sufficient evidence presented at trial through testimony and admitted exhibits to establish the purpose of sexual motivation, especially Chandler's response to receipt of the images with the message "fucking yum."

As to each of these convictions, evidence that suggested Roberson acted with motivation of sexual gratification for himself or for Chandler was presented to the jury both through testimony and through the messages exchanged between Roberson and Chandler, which were admitted as evidence. As to Roberson's invitation that we reweigh the evidence, our purpose is not to reweigh the evidence that was presented to the jury. Roberson's claim that we should do so is unavailing.

I

Next, Roberson contends that his attorney provided ineffective assistance of counsel because the attorney should have moved for a change of venue due to potential jury bias and also bias in news reporting. Roberson does not develop this argument, nor is relevant information tending to establish the claims contained in the record. Roberson thus does not establish an entitlement to appellate relief.

J

Finally, Roberson asserts that the trial court erred when it allowed a second video to be shown to the jury without it being properly admitted into

evidence. The record documents that one nude video of H.M. was properly admitted and played for the jury on a television monitor. Roberson appears to be mistaken that a second video was shown to the jury. Whether mistaken or not, he does not establish, on this record, that such an event took place.

The nude video of H.M., taken by Roberson and sent to Chandler on July 24, was labeled exhibit 211. Exhibit 212 was a still-shot taken from a different video taken on July 5 from Roberson's device. The still-shot was cropped to show Roberson's foot from an angle inside the master bedroom, looking out the door in order to prove that the nude video had been recorded from the same location and from the same device. There is no evidence in the record to suggest that the jury was shown a second video and thus we need not further consider this contention.

K

The other assertions Roberson makes provide neither developed arguments nor support in the record. Thus, they do not warrant further consideration. RAP 10.10(c).

VIII

All convictions are affirmed. The cause is remanded for vacation of the victim penalty assessment and supervision fee payment requirements. On

40

remand, the trial court should correct the judgment and sentence as set forth in Section VI, <u>supra</u>. Resentencing is not necessary.

WE CONCUR: